| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | )    1:11-CR-34 |
| v. | ) |
| | )    Collier/Carter |
| JEROME DUKINS and | ) |
| RODNEY MERELAN | ) |

## M E M O R A N D U M

Defendants Jerome Dukins and Rodney Merelan are charged with thirty counts of counterfeiting in violation of 18 U.S.C. § 472. Defendants moved to suppress all evidence found in the vehicle in which they were riding on March 4, 2011 (Court File Nos. 25, 26). These motions were referred to United States Magistrate Judge William B. Mitchell Carter, who held a hearing and subsequently filed a report & recommendation ("R&R") recommending Defendants' motions be denied (Court File No. 39). Defendant Merelan ("Defendant") then filed an objection to the R&R (Court File No. 43),[1] and the government responded (Court File No. 44). For the reasons discussed below, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 39). Accordingly, Defendants' motions to suppress will be **DENIED** (Court File Nos. 25, 26).

## I.    RELEVANT FACTS

With one exception, neither party challenges the Magistrate Judge's account of the testimony

---

[1] Both Defendants filed, on December 29, 2011, motions to extend the time period to object to the R&R (Court File Nos. 41, 42). Citing the need to review the transcript and the condensed holiday schedule, both Defendants requested an additional fourteen days to object to the R&R. The Court **GRANTS** these motions. Defendant Merelan filed an objection on January 11, 2012 (Court File No. 43)–within the additional fourteen-day period. Defendant Dukins, however, failed to file an objection during this period, and therefore waives his right to appeal this Court's order. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).

and evidence presented at the hearing. The Court will thus summarize the testimony and evidence as recounted by the Magistrate Judge, noting the one factual objection Defendant has made.

Angie Price is an asset protection coordinator for the Walmart store in Soddy Daisy, Tennessee. She has been a Walmart employee for eight years and worked in safety and security for the past six years. Amanda Johnson has been employed with the Walmart store in Soddy Daisy, Tennessee where she has been for the past four years. She has worked in loss prevention with Price for approximately one year. Both Price and Johnson received one month of training in loss prevention to identify shop lifters and scammers. Price has extensive experience in identifying scams, and Johnson testified that she has had experience in dealing with scams as well.

On February 28 and March 2, 2011, Angie Price and Amanda Johnson received two emails from two different Walmart stores within the Chattanooga area advising them to be on the lookout for individuals trying to pass counterfeit one hundred dollar bills. The first email stated, "Attempted to pass a counterfeit $100.00. He was accompanied by the young female half in the shot." The email was accompanied by a grainy picture of a black male and a black female taken from a store surveillance camera. The second email–sent March 2–stated *in toto*, "We just sold this gentleman two TV's and he paid with 5 - $100 counterfeit bills. May be coming to a store near you!" It was accompanied with a grainy picture of a black male taken from a store surveillance camera. Both Price and Johnson were previously familiar with scams in which individuals purchase high-end electronic items with counterfeit bills and go to another store to return them for real money, and both testified that they thought these emails referred to such a scheme.

The Soddy Daisy Walmart store where Price and Johnson are employed has approximately 200 cameras inside the store and 20-30 cameras on the store roof directed at the store parking lot.

Nearly every area within the store and the parking lot was therefore on camera. These security cameras post surveillance on three 42" security TVs with sixteen separate captions. These TVs are located inside the security office within the store.

On March 4, 2011, Price and Johnson were in the security office in the Soddy Daisy Walmart store watching the security TVs. One of the security cameras was focused on the service desk where returns are made, and Johnson saw a black male waiting to return what appeared to be an expensive camera, which he had placed on the counter. The man looked nervous as he was looking around, fidgeting, and texting on his cell phone. Johnson alerted Price who called the service desk to find out how the man had paid for the camera that he wanted to return. When an employee at the service desk loudly asked other employees at the service desk whether anyone had called security, Price hung up so as not to arouse the man's suspicions.[2]

Price then decided to roll back the surveillance tapes from the service area to the parking lot in order to determine from which vehicle the man had come. As she rewound the tape, she could see that he had come from a vehicle located closer to the back of the parking lot than the front entrance of the parking lot.[3] By continuing to watch the surveillance camera of the man's vehicle in the parking lot, Price and Johnson also noticed that about five minutes after the man had walked

_____

[2] At some later point, after the man had made the return, but before calling the police, Price again called the service desk. At that point, Price learned the man, who had a receipt, had paid with cash. Defendant objects to the Magistrate Judge's finding that Price learned anything from the service desk about the man in question or the transaction generally (Court File No. 43, p. 1). The suppression hearing transcript indicates Price did in fact call back after the suspect made the return. *See* Court File No.40, Transcript, p. 43 ("So I waited and called back after he had did [sic] the return, and that's when I found out it was a different . . . .").

[3] The surveillance tape introduced into evidence at the suppression hearing showed that there were open parking spaces closer to the front entrance.

to the service desk to make the return, another man exited the same vehicle, retrieved something from the trunk, and walked to the service desk to wait in line to make a return. The first man made his return and walked out of the service area passing the second man without speaking to or acknowledging him in any way. At some point during this process, while both men were still waiting to return their items, Price sent an employee to look at the tag of the men's vehicle and the employee reported back that it was an out-of-state tag. Johnson testified she was told the license plate was from New York and that the employee gave her the tag number. The government presented video tape from the Walmart store which confirmed Johnson's and Price's testimony.

Price and Johnson found the men's conduct as a whole to be very suspicious. They testified that in their experience shoplifters and scammers frequently park far from the entrance of the store and often arrive in vehicles with out-of-state tags. They also testified that scammers frequently purchase items fraudulently from one store and attempt to make a return to another store. Johnson also explained that it was significant that the men appeared to be texting because, in her experience, scammers are often texting someone inside or outside the store who is acting as a lookout during the scam. Price further testified that in her experience, persons involved in scams to make fraudulent returns generally retrieve merchandise from the trunk. Price and Johnson also noted that the first man frequently looked over his shoulder as if on the lookout and appeared very nervous. Based on all this information, including the fact that the first man had purchased the expensive camera with cash and that he did not acknowledge the second man who had come from the same car, Price decided to all Detective Charlie Kilgore with the Soddy Daisy Police Department.

Price explained the situation to Detective Gilgore who directed her to call police dispatch because he was on a call. Price called police dispatch and told them what she knew. A few minutes

later, at 6:24 pm, Soddy Daisy Police Officer Jimmy Wright pulled up in front of the store in his patrol car. Amanda Johnson walked outside and talked to him there in front of the store for approximately 2 ½ minutes. Johnson testified that Officer Wright told her she must provide him with enough information to have "reasonable cause" to stop the defendants' vehicle. Johnson told Officer Wright that the men had parked their vehicle far from the entrance, that the vehicle had an out-of-state tag, that the men had come from the same vehicle but had left it at separate times, and that both men had gone to the service desk to make returns of high-end electronics but neither had acknowledged the other. She explained that these factors fit a Walmart wide "BOLO"[4] for parties with out-of-state tags making purchases of high end electronics using counterfeit bills and then attempting to make returns at a different Walmart store for cash. Wright testified he understood the significance of the vehicle being parked far from the entrance as it was his experience that shoplifters and persons making fraudulent purchases or returns will park as far back as possible in the parking lot.

While Johnson was continuing to talk to him, Wright decided he needed to stop the suspect vehicle because it was pulling out of the lot and he felt he already had enough information to constitute reasonable suspicion. Wright notified K-9 Officer Craig Winners, who had already been dispatched to the Walmart parking lot, to assist him in the stop. At 6:25 pm, Winners and Wright stopped the defendants' vehicle in the parking lot. Winners' unmarked car parked immediately behind the defendants' vehicle and Wright's patrol car parked next to it. Winners exited his patrol car and approached the open driver's side window of the defendants' vehicle. As he looked into the back window, he could see what appeared to be a leafy material which he thought was marijuana

_____

[4]"BOLO" is an acronym for "be on the look out."

"shake" scattered on the back seat, and he could smell the faint odor of marijuana. There were three people in the vehicle. On defendant was sitting in the front passenger seat and the other defendant was sitting in the middle of the back seat. The driver is not one of the defendants in this case.

Winners explained marijuana "shake" is flakes of marijuana like that which might have fallen onto the seat and floor as a marijuana cigarette was rolled. He testified there was very little of it there but enough that he could identify it. He further testified that during his years as a police officer on the Soddy Daisy Police force, he has had many opportunities to investigate marijuana.

Winners then asked the driver to step out of the vehicle. He also asked the defendants to step out. The defendant who exited the back seat slid across the seat to exit out the back driver's side door; he did not shut the door. At this point, Detective Kilgore had also arrived on the scene. Kilgore asked for consent to search the vehicle, and consent was denied. The three men from the vehicle were patted down and led a few feet from the vehicle. Officer Winners walked his drug dog around the vehicle. The dog alerted on the seam between the driver's side front and back doors. During the walk around, the dog stuck his nose and head inside the vehicle through the opened driver's side back door.[5]

After Chase alerted on the vehicle by scratching and pawing at it, the officers conducted a search of the entire vehicle. They found $8,777.00 in cash in the console. Wright testified he thought some of it was counterfeit as the money felt "funny." It was determined that evening by an officer from the Secret Service that $5,100.00 of it was, in fact, counterfeit. The officers also found

---

[5] K-9 Officer Craig Winners has been with the Soddy Daisy Police Department for years. He has been a canine handler for two years. His dog, Chase, is certified for narcotics only and is recertified every year. Chase trains monthly and is certified to detect a number of controlled substances including marijuana. Winners himself is trained to avoid giving a dog cues in order to entice the dog to make alerts.

in the trunk, under a spare tire, three baggies of a green leafy substance which they believe to be marijuana packaged for resale. In addition they found a large number of electronics such as an I-Pods, I-Pads, cell phones, and camcorders, all still in their original packaging in the trunk. The total value of these items was later determined to be approximately $8,000. Some of the items were in Walmart bags and others were not, but they were immediately identifiable. Winners testified that upon seeing the electronics in the trunk, he immediately suspected the electronic were part of the suspected scam to buy high-end electronics with counterfeit money and return them for genuine money.

Pursuant to the Soddy Daisy Police Department's policy, because all three of the individuals in the vehicle were arrested, the car was seized and impounded and all the contents of the vehicle were inventoried including the electronics.

## II. STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R to which objection is made, 28 U.S.C. § 636(b)(1)(C). But *de novo* review does not require the district court rehear witnesses whose testimony has been evaluated by the Magistrate Judge. *See United States v. Raddatz*, 447 U.S. 667, 675-76 (1980). The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, putting him in the best position to determine credibility. *Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). The Magistrate Judge's assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

## III.    DISCUSSION

Defendant objects to one of the Magistrate Judge's factual findings and to his interpretation of the legal significance of four other facts.  All of these objections are offered in support of Defendant's argument: Officer Wright did not have reasonable suspicion to conduct a vehicle stop on the vehicle in which he rode.[6]  The Court first discusses the reasonable suspicion standard, and then conducts a *de novo* review of Defendant's objections.

### A.    Reasonable Suspicion

"To justify a brief, investigative stop under *Terry v. Ohio*, 392 U.S. 1(1968), an officer must point to specific, articulable facts that gave rise to a 'reasonable suspicion' that the suspect was engaged in criminal activity, *id.* at 21."[7]  *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011). An officer cannot locate such suspicion in "an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Instead, a "reasonable suspicion exists when, based on the totality of the circumstances, a police officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Baldwin*, 114 F.

---

[6] Defendant does not object to the Magistrate Judge's conclusion, assuming Officer Wright had reasonable suspicion to conduct the vehicle stop, Officers Wright and Winners had probable cause to search the vehicle in light of the marijuana odor and "shake" they witnessed.  Accordingly, the Court accepts and adopts this conclusion. *Cf. United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) ("[W]e find that Agent Perman's smelling the marijuana then constituted probable cause to believe that there was marijuana in the vehicle.").

[7] Typically a court engages in a two-step process when determining whether law enforcement had reasonable suspicion of criminal activity to make an investigative stop.  First, a court asks whether there was a proper basis for the stop.  If so, the court next examines whether the degree of intrusion was "reasonably related in scope to the situation at hand." *United States v. Mays*, 643 F.3d 537, 541-42 (6th Cir. 2011) (citation omitted).  Here, because Defendant objects only to the basis upon which Officer Wright conducted the investigative stop, the Court limits its analysis to that question.

App'x. 675, 679 (6th Cir. 2004) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

Thus, [w]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted).

Of particular relevance to this case is the requirement a court determine whether reasonable suspicion exists "in light of the totality of the circumstances." *Mays*, 643 F.3d at 542 (citation omitted). Analysis thus focuses on whether "the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (internal citations and quotation marks omitted). Indeed, totality of the circumstances analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008).

### B.      Factual Objection

As noted above, Defendant first objects to the Magistrate Judge's factual finding that the service desk told Price anything about the returned item, including what the item was, what it cost, and how it was originally paid for. Defendant bases this objection on the fact Price did not learn any information about the suspect or the transaction when she first called because she decided to hang up after someone from the service desk loudly inquired of other members of the service desk whether someone had contacted security. Not wanting to alert the suspected individual of any concerns, Price hung up, and called back later to find out about the nature of the transaction.

Although the precise timing of Price's second call–when she learned more about the suspected individual and the earlier transaction–is not entirely clear from the record, Defendant's objection is overstated. Defendant claims Price did not learn "anything at all about the return" from the service desk (Court File No. 43, p. 1). But the section transcript quoted by Defendant in his motion belies this very argument. Price testified as follows

> And when I first called [the service desk], they didn't actually tell me anything. I asked–you know, I was going to ask a question and the person that answered the service desk phone told me that–hollered at the other girl and said "Hey, did you call Security?" So when she said that, I just hung up the phone, because I thought, well I didn't want to, you know, scare anybody or spook anybody over there. *So I waited and called back after he had did the return, and that's when I found it was a different . . .*

*Id.* (quoting Court File No. 40, Transcript, p. 43) (emphasis added). Although the government interrupted Price's testimony before she described what she learned from the service desk, it is clear she spoke with someone from the service desk and learned some additional information about the suspect and the transaction. Although the record does not make clear precisely what additional information Price learned, the record does not support Defendant's claim Price learned nothing at all about the suspect or the transaction from the service desk.

Ultimately, this objection, even if the Court found it well taken, does not overcome the considerable evidence already in the record regarding Price's and Johnson's reasonable suspicion–a reasonable suspicion subsequently shared by Officer Wright–that some criminal activity was afoot. Even if the service desk had never answered the phone, or if Price had not called back, there remains considerable additional evidence supporting reasonable suspicion in this case: the emails indicating a fraudulent scheme to purchase items with counterfeit cash at other Walmart locations,[8] the car

---

[8] Although the Magistrate Judge did not find the email alerts to be an important factor to support reasonable suspicion in this case because the suspects pictured in the email attachments did

parked far away from the Walmart, the return of high-end merchandise, the out-of-state license plate, the nervous demeanor of the suspects, and the suspects not acknowledging each other although coming from the same vehicle. Although Defendant argues many, if not all, of these facts have innocent explanations, this argument fails to account for the aggregate effect of these facts. The Court turns to this argument now.

### C. Objections to the Sufficiency of the Evidence Supporting Reasonable Suspicion

Defendant objects to the Magistrate Judge's finding that reasonable suspicion justified the investigative stop conducted by Officers Wright and Winners. Although not clearly delineated, Defendant appears to focus on four particular aspects of the incident. In each instance, Defendant offers an alternate explanation for the allegedly suspicious conduct. Taken together, Defendant claims the Magistrate Judge's finding that Officer Wright had reasonable suspicion to conduct the investigative stop is flawed.

First, Defendant objects to Magistrate Judge's determination that a car parked far away from the Walmart entrance should arouse any suspicion at all. The R&R noted parking spaces closer to the front were available, Court File No. 39, R&R, p. 3, n.1, and Price testified that every car that parks closer to the end of the parking lot–farther away from the entrance–arouses "automatic

---

not resemble Defendants in this case, Court File No. 39, R&R, p. 10 n.4, the Court views this matter somewhat differently. Price and Johnson, as well as Officer Wright and Detective Kilgore, could well have suspected Defendants to have been working together with or in some way associated with the fraudsters identified in the Walmart emails. Moreover, the timing of the emails is similarly important. Price and Johnson received the first email on February 28 and the second on the afternoon of March 2, 2011–only two days before the incident in question. Accordingly, it is sensible to conclude concern about such a scam would be relatively fresh in their minds, and thus provide important support for a finding of reasonable suspicion on the part of Officer Wright, who learned about these emails from Johnson. Finally, it is also relevant that there is no dispute about the reliability of the BOLO email alerts.

suspicion" (Court File No. 40, Trans., p. 56).  Officer Wright observed that in his experience, "the shoplifters . . . and the fraudulent schemes that [he has] responded to, they all park the furthest from the entrance that's possible.  That's been my experience on just about every call I've ever went out there on" (Court File No. 40, Transcript, p. 124).  Defendant, however, claims someone may park far away from the store to avoid damage to his car, or to get some exercise.

Second, Defendant objects to the finding that an out-of-state plate generates any suspicion. Defendant further argues because the plate was from New York, and thus the vehicle would presumably have come all the way from New York to commit a scam, it is improbable the vehicle would have traveled so far simply to be used in a fraudulent scheme.  Johnson testified she was trained to regard any out-of-state tag with suspicion (*id.* at 108).  Officer Wright noted although he did not regard every out-of-state plate with suspicion, he did find it relevant in reaching his decision to conduct the investigative stop when considered alongside the other information he received (*id.* at 146).

Third, Defendant takes issue with the Magistrate Judge's finding that reasonable suspicion arose in part because the two men making returns did not acknowledge each other even though they came from and returned to the same vehicle.  Defendant argues no conclusion should properly be drawn from this fact because perhaps the individuals in question had had an argument, although Defendant then concedes "this would be the only suspicious piece of information that existed" (Court File No. 43, p. 3).  Johnson, Price, and Officer Wright all indicated this non-acknowledgment aroused their suspicion.

Finally, Defendant objects to reliance on any evidence of fidgeting, nervousness, or texting as a basis for finding of reasonable suspicion.  In each case, Defendant asserts, there is a plausible

and innocuous explanation. The suspects could have fidgeted because they were forced to wait for a long time in line. Moreover, the mere fact one of the suspects was texting is no longer probative of criminal activity (if it ever was), given how widespread the behavior is. Thus, in Defendant's view, neither fidgeting or texting should provide a basis for a finding of reasonable suspicion.[9]

In response to these four objections, the government faults Defendant's approach in offering a possibly innocuous explanation for each of the four without properly taking into account their cumulative effective on a law enforcement officer (Court File No. 44, pp. 4-5). This is indeed how Defendant's argument falls short. It is well settled that a court considers the totality of the circumstances when determining whether reasonable suspicion to conduct an investigative stop exists, *Mays*, 643 F.3d at 542, and that even if a innocent or innocuous explanation is plausible for individual facts, the court must nonetheless consider whether "the individual factors, taken as a whole, give rise to reasonable suspicion," *Perez*, 440 F.3d at 371. Even if the Court were to credit the alternative explanations offered by Defendant in all four instances offered–some of which strike the Court as dubious at best[10]–the Court might still find reasonable suspicion existed for Officer Wright to conduct the *Terry* stop. But the reasonable suspicion analysis is not conducted in the closeted and piecemeal fashion advocated by Defendant.

---

[9] Defendant notes the Magistrate Judge in fact "appropriately . . . did not seem to make much of this information or use it in his analysis" (Court File No. 43, p. 4).

[10] Although the Court finds plausible Defendant's argument that texting should not be considered inherently suspicious, the Court is not persuaded by the alternate explanations for the vehicle's location and the failure of the two suspects to acknowledge each other. Notably, in neither case is there even a scintilla of evidence suggesting these alternate explanations are true. Finally, the Court does not understand Defendant, in his argument about the out-of-state plate, to be offering an alternate explanation but rather to be arguing this fact should not be considered suspicious. If this fact were the only basis for reasonable suspicion, the Court might agree–but it is far from the only basis for such reasonable suspicion.

Considering the totality of circumstances in this case, the Court concludes Officer Wright had reasonable suspicion to conduct an investigative stop of the vehicle in which Defendants were riding. The Court reaches this conclusion because when Officer Wright decided to make the investigative stop, he knew or had reason to believe: 1) Defendants had parked their vehicle far from the Walmart, which was consistent in his experience with individuals involved in shoplifting or a fraudulent scheme; 2) the vehicle had an out-of-state–that is, a New York–license plate, which also in his experience contributed to concerns about possible criminal activity; 3) Defendants had come and returned to the same vehicle when making their returns, but had not acknowledged each other while passing; 4) Defendants had receipts for cash purchases of high-end electronics, which was in part consistent with email alerts concerning a scheme to use counterfeit currency shared with him by Walmart asset protection employees; and 5) according to observations of Walmart asset protection employees shared with him, Defendants seemed nervous and appeared to be scanning the nearby area and using their cell phones to send text messages in a suspicious manner. The Court's conclusion that Officer Wright had reasonable suspicion relies on all of these factors considered together, in light of Wright's "own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *Pearce*, 531 F.3d at 380.

Because Officer Wright had reasonable suspicion Defendants were engaged in criminal activity, his investigative stop was constitutionally justified. Defendant does not challenge the Magistrate Judge's finding that Wright and Officer Winners then had probable cause to search the vehicle after smelling the odor of marijuana and seeing marijuana "shake" in the vehicle. Accordingly, the Court further concludes the resulting search of the vehicle was permissibly within

the scope of the Fourth Amendment.


**IV.     CONCLUSION**

      After reviewing the record, the Court finds the Magistrate Judge properly concluded Officer

Wright had reasonable suspicion to conduct an investigative stop of the vehicle in which Defendants

were riding.  Accordingly, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 39).

Defendants' Motions to Suppress will be **DENIED** (Court File Nos. 25, 26).


                    **/s/**_____
                    **CURTIS L. COLLIER**
                    **CHIEF UNITED STATES DISTRICT JUDGE**